CURRY ADVISORS
A Professional Law Corporation
 K. Todd Curry (149360)
525 B Street, Ste. 1500
San Diego, California 92101
Telephone:  (619) 238-0004
Fax Number: (619) 238-0006

Counsel for Debtor / Debtor In Possession
Tierra Del Rey, LLC

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | CASE NO.  15-04253-LT11 |
| TIERRA DEL REY, LLC | Chapter 11 |
| Debtor. | DEBTOR'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ***EMERGENCY MOTION*** FOR ORDER AUTHORIZING USE OF CASH COLLATERAL PENDING A NOTICED HEARING |
| | DECLARATION OF CHERYL R. LEE |
| | DECLARATION OF K. TODD CURRY |
| | Continued Hearing: |
| | Date:   November 16, 2015<br>Time:  9:00 a.m.<br>Dept:   Three<br>Honorable Laura S. Taylor |

**TO FANNIE MAE, AP MORTGAGE COMPANY, INC., THE UNITED STATES**

**TRUSTEE, AND THE TWENTY LARGEST UNSECURED CREDITORS:**

Debtor / Debtor In Possession Tierra Del Rey, LLC (the "Debtor") respectfully files this

supplemental memorandum in support of its emergency motion for use of cash collateral (the

"Motion") [Docket No. 76].

/ / /

# I.

## SUPPLEMENTATION OF INSIDER COMPENSATION REQUEST

The Debtor hereby supplements its Motion with respect to proposed compensation (and retroactive reimbursement) for the Director of Finance, Chief Operating Officer, and the CEO/Chief Legal Officer.  The Debtor requests that such payments be authorized.  The officers whom the Debtor proposes to pay have not received payment since before the Receiver was appointed in April of 2015.  *See* the accompanying Supplemental Declaration of Cheryl Lee dated October 22, 2015 ("Supplemental Lee Declaration"), ¶ 2.

**Director of Finance.**  The duties of the Director of Finance include the following: Oversight of vendors, vendor payments, budget planning, banking, updating and sustaining internal and external financial reporting, including cash flow reporting\rent receivables, preparing the monthly operating reports that are filed with the Court, preparing reports needed by the auditors, negotiating and interacting with the Debtor's vendors, and purchasing appliances, equipment, and office supplies.  She spends approximately 65 hours per week on duties for the Debtor and the Debtor's parent, of which approximately 35 hours are spent on duties for the Debtor.  Her proposed compensation by the Debtor has been pro rated based on her normal total salary and the relative time spent on Debtor and non-Debtor activities.

**Chief Operating Officer.**  The duties of the Chief Operating Officer include the following: Approving and communicating payroll to the payroll service, handling human resources matters, including supervision of the manager and maintenance personnel at the Debtor's real property, maintaining the Debtor's website and marketing efforts, including working with various government affiliated programs that refer tenants to the Debtor.  She spends approximately 60 hours per week on duties for the Debtor and the Debtor's parent, of which approximately 25 to 30 hours are spent on duties for the Debtor.  Her proposed compensation by the Debtor has been pro rated based on her normal total salary and the relative time spent on Debtor and non-Debtor activities.

**CEO / Chief Legal Officer.**  The duties of the CEO / Chief Legal Officer include general oversight of the Debtor's business and personnel, responsibility for working with the auditors

1    and oversight of preparation the annual consolidated audited financial statement (which covers

2    the Debtor and its parent), corporate compliance (including administrative issues with the

3    Secretary of State and Franchise Tax Board), selecting and working with outside counsel in the

4    Chapter 11 case (including development of a reorganization strategy) and other litigation matters,

5    initiation and management of efforts to refinance the Debtor's property, and managing eviction

6    decisions and legal proceedings.  She spends approximately 80 hours per week on duties for the

7    Debtor and the Debtor's parent, of which approximately 60 hours are spent on duties for the

8    Debtor.  Her proposed compensation by the Debtor has been capped at one-third of her total

9    normal salary even though she spends approximately 75% of her time on Debtor-related matters.

10   Lee Declaration, ¶¶ 3-5.

11       The Debtor has researched salary data at www.indeeed.com and determined that the

12   average salary for a Chief Financial Officer is approximately $150,000 per year ($12,500 per

13   month), which would support the Debtor's payment of up to $6,250 per month based on pro

14   ration of the Direct of Finance's time.  The Debtor is requesting $2,916.00 per month.

15       The Debtor has determined that the average salary for a Chief Operating Officer is

16   approximately $121,000 per year ($10,000 per month), which would support the Debtor's

17   payment of up to $5,000 per month based on pro ration of the Chief Operating Officer's time.

18   The Debtor is requesting $3,461.54 per month.

19       The Debtor has determined that the average salary for a Chief Executive Officer exceeds

20   $190,000 per year ($15,833 per month), which would support the Debtor's payment of almost

21   $12,000 per month based on how much time she spends on Debtor-related matters.  The Debtor

22   is requesting $5,000 per month.

23   Lee Declaration, ¶¶ 6-8 & Exhibit 1.

24                              **II.**

25             **PAYMENTS TO THE PARENT ARE REIMBURSEMENTS.**

26       Fannie Mae correctly points out in its initial opposition [Docket No 82] that some post-

27   petition payments of cash collateral are being made to the Debtor's parent entity.  However, these

28   payments are not gifts or "raids of the cookie jar" as Fannie Mae baselessly contends.  They are

1   reimbursements for items listed in the approved cash collateral Budget, and Fannie Mae knows

2   it.   The largest of these items is payroll, because the parent handles payroll for itself and all

3   related entities, and the Debtor reimburses its parent on account of expenses associated with the

4   employees who devote 100% of their time to the Debtor.  (Such employees do not include

5   management personnel, who devote a portion of their time to the Debtor, who have not received

6   payment since before the Receiver was appointed in April of 2015, and who are discussed

7   above.)  *See* the Lee Declaration, ¶ 9.

8                                                   **III.**

9                          **CASH COLLATERAL SHOULD BE USED**

10                              **TO PAY PROPERTY TAXES.**

11          The Debtor hereby supplements it request to use cash collateral so that it may make

12   property tax payments before they become delinquent.  Impound amounts paid to Fannie post-

13   petition should be used for that purpose, with the Debtor supplementing such amounts as

14   necessary.

15                                                   **IV.**

16             **THE COURT'S ASSISTANCE REGARDING PAST USAGE OF**

17          **CASH TO PAY EMPLOYEE-RELATED COSTS ALSO IS REQUESTED**.

18          During the October 22, 2015 meeting of creditors, Fannie raised for the first time an issue

19   regarding payroll, which is that the previously stipulated cash collateral Budget, which was in

20   effect through September 29, 2015 and which has been extended on an emergency basis,

21   provides for monthly payroll of $5,208 (Docket No. 24), whereas the Debtor's operating reports

22   for August and September show payroll payments of approximately $7,400 per month.  To be

23   clear, these payroll payments are associated only with on-site personnel who spend 100% of their

24   time on Debtor-related activities, specifically, for operation and maintenance of the Debtor's real

25   property, and they cover salary, medical, life, and dental insurance, workers compensation,

26   payroll taxes, and Paychex fees.  Lee Declaration, ¶ 10.

27          The first emergency cash collateral motion, to approve a stipulation, summarized the

28   relief sought and stated: "The Debtor may pay the expenses listed in the Budget attached as

1   Exhibit 1 to the Stipulation (which is attached to this Emergency Motion as Exhibit "A"). A

2   variance in the Budget of up to 5% is permitted without Fannie Mae's consent."  Docket No. 15

3   at p. 1.  This summary caused confusion because it suggested that a variance of up to 5% (*i.e.*,

4   $2,250) of the almost $45,000 per month monthly Budget was permissible.  Lee Declaration,

5   ¶ 11.  However, the actual Stipulation provides for 5% variance on a total ***and*** line item basis.

6   The Debtor requests that the Court approve the prior payments associated with the on-site

7   personnel, even though they inadvertently exceeded the previously stipulated allowable amounts,

8   because they all are necessary and required expenses associated with employment of the on-site

9   personnel that operate, manage, and maintain the real property.

10          Fannie objects to payment of the expenses associated with on-site personnel, but it has no

11  basis for doing so other than if it objects and the employees quit because their benefits are

12  eliminated, the Debtor will have a more difficult time operating the property such that liquidation

13  (and resulting payment to Fannie of the pre-payment penalty) would be more likely.  The Court

14  should approve the past payroll expenses for on-site personnel as well as future expenses for such

15  personnel.  The expenses are detailed in the proposed revised budget attached to the Motion.  *See*

16  Docket No. 76.

17                                                      **V.**

18                      **FANNIE MAE'S INITIAL OPPOSITION IS REPLETE WITH**

19                      **MISSTATEMENTS AND OMISSIONS OF MATERIAL FACTS.**

20          Fannie has turned hostile because the Debtor proposed a plan of reorganization filed on

21  September 25, 2015 would keep Fannie's loan in place instead of refinancing.  Docket No. 67.

22  Fannie's recent payoff statement reveals that it expects to receive an enormous prepayment

23  penalty of $634,502.18 in connection with any refinancing or sale of the real property.  *See*

24  Exhibit 3.  Clearly then, Fannie needs to have the property sold or refinanced, lest the windfall be

25  lost.

26          In its zeal to collect the enormous pre-payment penalty, Fannie lost sight of the true facts

27  and made multiple blatantly incorrect representations to the Court in its initial Opposition.

28  Docket No. 82.  The Debtor addressed some of those incorrect representations informally during

the October 8, 2015 initial hearing on the Emergency Motion.  The Debtor will address the incorrect representations formally here.

*Allegation:*  "Fannie Mae asserts that the Debtor received zero consideration for the funds diverted pre-petition by the Parent Company.  Unbelievably, the Debtor has made no disclosures in its schedules about how much the Parent Company diverted from the Debtor prior to filing its bankruptcy petition, made no effort to recover such funds, and filed no action to recover such diverted funds from insiders." Opposition at 3.

*Response:*  The Debtor and its parent are non-profit entities.  Payments by the Debtor to its parent constitute reimbursements for the Debtor's expenses paid by the parent, including payroll (which is a significant expense).  Lee Declaration, ¶ 12.  During the October 21, 2015 meeting of creditors, it was agreed that the Debtor would gather and report information concerning pre-petition reimbursements to the parent.  Importantly, while obviously impliedly asserting that the Debtor has legal grounds to recover reimbursements from the parent, Fannie has not indicated on what legal basis they would be recoverable.  Why not?  Because it initially appears that they are not recoverable at all.  The Debtor has not been insolvent anytime in the recent past,[1] and the reimbursements were all made in the ordinary course of business, making it unlikely that the reimbursements would be recoverable.  *See* 11 U.S.C. § 547(b)(3), (c)(2)(A); Lee Declaration, ¶ 13.  Notably, the parent contributed approximately $3 million to the Debtor to enable the Debtor to acquire the real property, and the parent contributed another approximately $1.6 million toward a 2010 renovation of the property.  Lee Declaration, ¶ 14.  Moreover, the Debtor expressly preserved in its proposed plan the right to pursue causes of action, if any exist. *See* Docket No. 67 at p. 18.  Finally, if creditors are fully paid through the plan as the Debtor contemplates, it is too soon to determine whether the parent must be sued to recover anything. Fannie's support of premature litigation and running up of potentially unnecessary administrative expenses is troubling.

---

[1]  Fannie's recent appraisal supports the Debtor's position regarding value of the property (*see infra* at note 3), leaving the Debtor solvent to the extent of millions of dollars.  *See* the Debtor's Schedules, Docket No. 1.

1    *Allegation:* "The Franchise Tax Board had suspended the Debtor."  Opposition at 3.

2    *Response:*  Although this allegation is one of the few true allegations, some background

3    is necessary to put the now-corrected FTB suspension in proper context.  When the FTB

4    suspension was discovered post-petition, Ms. Lee investigated and discovered that a prior

5    manager at the Debtor's parent had submitted a group non-profit tax exemption application that

6    would cover the Debtor, but no one followed up on it.  When Ms. Lee pursued the application, it

7    was granted, the Debtor was deemed a tax exempt entity and owed no income tax, and the FTB

8    suspension was lifted.  Lee Declaration, ¶ 15.

9    *Allegation:* "The Debtor owed the Franchise Tax Board taxes dating back to 2009; the

10   Debtor had (apparently) not filed tax returns in several years."  Opposition at 3.

11   *Response:*  As noted above, the Debtor does not owe the FTB any taxes because the

12   Debtor was found to be covered by the parent entity's group exemption.  The Debtor filed

13   Amended Schedule E on September 30, 2015, and Fannie Mae's counsel is on the ECF service

14   list and received the amendment.  *See* Docket No. 71.  Why then, would Fannie Mae assert that

15   the Debtor owes taxes back to 2009 when that clearly is not the case?  The Debtor's operations

16   are covered by the parent's consolidated tax returns, which are current, so there are no delinquent

17   tax returns for the Debtor.  Lee Declaration, ¶ 16.

18   *Allegation:* When banks would not open the debtor in possession bank accounts while

19   the FTB suspension was still in effect, the debtor failed "for several months" to open the

20   accounts, "in violation of the U.S. Trustee's requirements."  Opposition at 3.

21   *Response:* Fannie is fully aware that the Debtor obtained this Court's express

22   authorization to use non-DIP accounts pending resolution of the FTB suspension issue.  *See*

23   Docket No. 4 at p. 3 of 22 (cash collateral order).  Fannie's counsel was notified on August 17,

24   2015 that the FTB suspension had been lifted.  Fannie's counsel was notified on September 10,

25   2015 that the official DIP accounts had been opened, so the accounts were opened a little more

26   than 60 days after the petition date, not "several months" after the petition date.  *See* Exhibits 4

27   and 5.  The Debtor should not have to correct Fannie's exaggerations, which are designed to

28   / / /

1   prejudice the Debtor's efforts to reorganize and to enhance Fannie's chances of receiving its

2   windfall prepayment penalty.

3       *Allegation:*  "[T]he Debtor failed to timely pay its monthly obligations to Fannie Mae

4   both pre-petition and during the pendency of the just expired Order approving the cash collateral

5   stipulation; Fannie Mae notified and placed the Debtor in default each month under the Cash

6   Collateral Stipulation, which expired on September 29, 2015."  Opposition at p. 3.

7       *Response:*  Regarding post-petition payments to Fannie, the Stipulation For Use of Cash

8   Collateral, which was effective July 1, 2015 pursuant to Court order entered July 23, 2015

9   [Docket No. 24], required payments be made to Fannie on the first of each month.  (The

10  underlying loan documents provided, as is typical, that payments were not late until after the

11  tenth date of the month.)  The July and August 2015 payments to Fannie were made via wire

12  transfer on August 6, 2015.  The September payment was made via wire transfer on September 8,

13  2015.  Lee Declaration, ¶ 17.  As Fannie Mae knows, the Debtor needs rents from its tenants to

14  pay Fannie Mae, and most of those rents normally are received during first few days of each

15  month, so it was virtually impossible for the Debtor to make large payments to Fannie before

16  approximately the sixth or eighth day of the month.  Of course, Fannie Mae knew this when it

17  entered into the Stipulation.  In the mid to late July 2015 rush to obtain use of cash to operate the

18  real property (after having no use of cash from the June 29, 2015 petition date), the Debtor and

19  its counsel overlooked this fact, and the Debtor assumed it would be acceptable to pay when the

20  tenants' rents became available.  Debtor's counsel proactively approached Fannie Mae's counsel

21  on August 31, 2015, and explained that a few extra days were needed.  Fannie Mae's response

22  was that no extension would be granted.  *See* Exhibit 6.  Although Fannie's contention about

23  "late" post-petition payments technically is true because the payments were not made on the first

24  of each month, its omission of the forgoing material facts make its contention misleading.  (On or

25  about September 14, 2015, the receiver turned over $79,041.07 to the Debtor for deposit into the

26  DIP bank accounts, and those funds are expected to provide a cushion such that the Debtor does

27  not expect to need to pay Fannie after the first of each month going forward.)

28  / / /

With regard to **pre-petition** payments, Fannie neglected to disclose that the Receiver took over in April of 2015 and the Receiver failed to make the April, May, and June payments. These were the only delinquent pre-petition payments owed to Fannie as of the June 29, 2015 petition date. *See* Exhibit 2 to the Motion (showing that only one payment had been missed as of May 1, 2015). Fannie also failed to disclose that before the Receiver was appointed, the Debtor arranged in late March of 2015 to have excess funds ($21,481.23) held in its impound account applied toward the April 2015 payment–a process the Debtor and Fannie's loan servicer had agreed to in prior years. However, the Receiver's appointment scuttled that pending arrangement, and then the Receiver failed to make payments to Fannie, which resulted in a monetary default on the obligation owed to Fannie. Lee Declaration, ¶ 18 & Exhibit 2.

*Allegation:* The Debtor misled Fannie Mae by claiming to be seeking financing from a credit union . . . ." Opposition at 3.

*Response:* Fannie Mae's unsubstantiated hyperbole is false. The Debtor did seek financing from the credit union, as well as from multiple other sources. The Debtor was disappointed when it was told that the credit union does not make loans to debtors in bankruptcy. The Debtor never misled Fannie in any manner. The Debtor presently is exploring a possible sale of the real property to its parent, who the Debtor believes can obtain financing to pay off creditors in full. (The Debtor's plan would need to be amended to provide for a sale of the real primary resolution to the case instead of as a secondary resolution.)   Lee Declaration, ¶ 19.

*Allegation:* "The Debtor . . .  remains unable to secured new financing . . . ." Opposition at 3-4.

*Response:* Although the Debtor has not yet obtained a loan commitment, refinancing is not the only means of reorganizing the Debtor's financial affairs. Restructuring its loan obligations, or a sale of the real property, are viable options as well. Of course, Fannie does not see it that way, because restructuring of its loan will prevent it from obtaining a windfall in the form of a huge pre-payment penalty.

**Allegation**. "Even the Receiver charged only $3250 per month and retained the Debtor's property manager." Opposition at 9.

1    **Response:** First, it is unclear whether Fannie is claiming that the $3,250 includes the on-

2    site personnel.  Certainly, the $3,250 ***does not*** include the on-site personnel, whose salaries and

3    benefits cost approximately $7,400 per month, but Fannie leaves a different impression.  More

4    importantly than that, the Receiver filed his Application for payment on September 29, 2015.

5    *See* Docket No. 68.  The Application reveals that the Receiver seeks compensation of $17,893.60

6    (Application at p.2 of 61) after having paid his own management company (Trigild) more than

7    $8,000 in May of 2015, approximately $16,001 in June of 2015, and more than $4,000 in July of

8    2015 (post-petition, after the Debtor regained possession). *See* Exhibit C to the Application.  The

9    total cost of the Receiver and his management company thus exceeded $45,000 for the

10   approximately two months (late April to late June) that the Receiver was in possession.  ***That***

11   ***$22,500 per month is grossly more than the $3,250 that Fannie represents to this Court that***

12   ***the Receiver charged.***  Troubling is that Fannie's counsel is on the ECF service list and was

13   served with the Receiver's Application more than one week before Fannie filed its Opposition on

14   October 7, 2015.[2]  ***So why did Fannie represent to the Court that the Receiver charged only***

15   ***$3,250 per month?***  Fannie needs to explain this gross misstatement of fact.  It also bears noting

16   that while the Receiver charged about double what the Debtor proposes to pay to its officers,

17   unlike the officers, the Receiver (chosen and put in place by AP Mortgage Company) would not

18   be working on the numerous time consuming tasks relevant to the reorganization effort,

19   including seeking refinancing, attending hearings and the meeting of creditors, and working

20   closely with the Debtor's counsel.

21                                                          **VI.**

22                                    **FANNIE LACKS CREDIBILITY.**

23           The fact is, Fannie is the one who lacks credibility here, as it appears to have been

24   blinded by its sole purpose in this case, which is to obtain a windfall of more than $600,000 in

25   the form of a prepayment penalty.  Fannie appears to have taken over from AP Mortgage in

26   _____

27           [2] Not unexpectedly, Fannie cites no evidence whatsoever in support of the supposed
     $3,250 per month charged by the Receiver, thereby underscoring why allegations not supported
28   by evidence are inadmissible.

1    leading the charge to force a sale of the Debtor's property, which would lead to cessation of use

2    of the property for affordable housing, and which would lead to eviction of the tenants by a

3    purchaser seeking to increase profits.[3]  To eliminate the risk of losing the prepayment penalty,

4    Fannie needs to terminate the Debtor's control of the bankruptcy case, and unfortunately, Fannie

5    appears willing to do or say anything to achieve its goal.

6                                              **VII.**

7                                        **CONCLUSION**

8         For the reasons stated above and in the Motion, the Debtor requests that it be authorized

9    to use cash collateral effective October 1, 2015 as set forth in the Motion and in the proposed

10   Budget, and that the additional relief requested in this supplemental memorandum be granted.

11

12   Dated: October 22, 2015                    CURRY ADVISORS
                                                A Professional Law Corporation
13
                                                /s/ K. Todd Curry
14                                   By:    _____
15                                              K. Todd Curry
                                                Counsel for Debtor / Debtor In Possession
16                                              Tierra Del Rey, LLC

17

18

19

20

21

22

23

24

25

26   _____

27        [3]  AP's counsel admitted on October 8, 2015 that it abandoned its relief from stay motion
     when Fannie's appraisal revealed that the Debtor's real property was worth closer to what the
28   Debtor said it was worth.  *See* the accompanying Declaration of K. Todd Curry, ¶ 6.  It bears
     noting that Fannie has not sought relief from stay.

# DECLARATION OF CHERYL R. LEE

I, Cheryl R. Lee, declare as follows:

1.        I am the Chief Executive Officer of Bay Vista Methodist Heights, Inc. ("BVMH"), which is the manager and sole owner of debtor / debtor in possession Tierra Del Rey, LLC (the "Debtor").  I also am an attorney at law licensed in the states of California and Michigan.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, I would be competent to testify to such facts.

2.        The officers whom the Debtor proposes to pay (Director of Finance, Chief Operating Officer, and CEO/Chief Legal Officer) have not received payment since before the Receiver was appointed in April of 2015.

3.        **Director of Finance.**  The duties of the Director of Finance include the following: Oversight of vendors, vendor payments, budget planning, banking, updating and sustaining internal and external financial reporting, including cash flow reporting\rent receivables, preparing the monthly operating reports that are filed with the Court, preparing reports needed by the auditors, negotiating and interacting with the Debtor's vendors, and purchasing appliances, equipment, and office supplies.  She spends approximately 65 hours per week on duties for the Debtor and the Debtor's parent, of which approximately 35 hours are spent on duties for the Debtor.  Her proposed compensation by the Debtor has been pro rated based on her normal total salary and the relative time spent on Debtor and non-Debtor activities.

4.        **Chief Operating Officer**.  The duties of the Chief Operating Officer include the following: Approving and communicating payroll to the payroll service, handling human resources matters, including supervision of the manager and maintenance personnel at the Debtor's real property, maintaining the Debtor's website and marketing efforts, including working with various government affiliated programs that refer tenants to the Debtor.  She spends approximately 60 hours per week on duties for the Debtor and the Debtor's parent, of which approximately 25 to 30 hours are spent on duties for the Debtor.  Her proposed compensation by the Debtor has been pro rated based on her normal total salary and the relative time spent on Debtor and non-Debtor activities.

5. **CEO / Chief Legal Officer.** The duties of the CEO / Chief Legal Officer (myself) include general oversight of the Debtor's business and personnel, responsibility for working with the auditors and oversight of preparation the annual consolidated audited financial statement (which covers the Debtor and its parent), corporate compliance (including administrative issues with the Secretary of State and Franchise Tax Board), selecting and working with outside counsel in the Chapter 11 case (including development of a reorganization strategy) and other litigation matters, initiation and management of efforts to refinance the Debtor's property, and managing eviction decisions and legal proceedings. I spend approximately 80 hours per week on duties for the Debtor and the Debtor's parent, of which approximately 60 hours are spent on duties for the Debtor. My proposed compensation by the Debtor has been capped at one-third of my total normal salary even though I spend approximately 75% of my time on Debtor-related matters.

6. We have researched salary data at www.indeeed.com (the information is attached as Exhibit 1) and determined that the average salary for a Chief Financial Officer is approximately $150,000 per year ($12,500 per month), which would support the Debtor's payment of up to $6,250 per month based on pro ration of the Direct of Finance's time. The Debtor is requesting $2,916.00 per month.

7. We have determined that the average salary for a Chief Operating Officer is approximately $121,000 per year ($10,000 per month), which would support the Debtor's payment of up to $5,000 per month based on pro ration of the Chief Operating Officer's time. The Debtor is requesting $3,461.54 per month.

8. We have determined that the average salary for a Chief Executive Officer exceeds $190,000 per year ($15,833 per month), which would support the Debtor's payment of almost $12,000 per month based on how much time I spend on Debtor-related matters. The Debtor is requesting $5,000 per month.

9. Post petition payments of cash collateral to the Debtor's parents are reimbursements for items listed in the approved cash collateral Budget The largest of these items is payroll, because the parent handles payroll for itself and all related entities, and the Debtor

reimburses its parent on account of expenses associated with the employees who devote 100% of their time to the Debtor.  (Such employees do not include management personnel, who devote a portion of their time to the Debtor, who have not received payment since before the Receiver was appointed in April of 2015, and who are discussed above.)

10.    During the October 22, 2015 meeting of creditors, Fannie raised for the first time an issue regarding payroll, which is that the previously stipulated cash collateral Budget, which was in effect through September 29, 2015 and which has been extended on an emergency basis, provides for monthly payroll of $5,208, whereas the Debtor's operating reports for August and September show payroll payments of approximately $7,400 per month.  To be clear, these payroll payments are associated only with on-site personnel who spend 100% of their time on Debtor-related activities, specifically, for operation and maintenance of the Debtor's real property, and they cover salary, medical, life, and dental insurance, workers compensation, payroll taxes, and Paychex fees.

11.    The first emergency cash collateral motion, to approve a stipulation, summarized the relief sought and stated: "The Debtor may pay the expenses listed in the Budget attached as Exhibit 1 to the Stipulation (which is attached to this Emergency Motion as Exhibit "A"). A variance in the Budget of up to 5% is permitted without Fannie Mae's consent."  I believed this meant that a variance of up to 5% (*i.e.*, $2,250) of the almost $45,000 per month monthly Budget was permissible.

12.    The Debtor and its parent are non-profit entities.  Payments by the Debtor to its parent constitute reimbursements for the Debtor's expenses paid by the parent, including payroll (which is a significant expense).

13.    Reimbursements to the parent by the Debtor are made in the ordinary course of business.

14.    The Debtor's parent contributed approximately $3 million to the Debtor to enable the Debtor to acquire the real property, and the parent contributed another approximately $1.6 million toward a 2010 renovation of the property.

/ / /

15.    When the FTB suspension was discovered post-petition, I investigated and discovered that a prior manager at the Debtor's parent had submitted a group non-profit tax exemption application that would cover the Debtor, but no one followed up on it.  When I pursued the application, it was granted, the Debtor was deemed a tax exempt entity and owed no income tax, and the FTB suspension was lifted.

16.    The Debtor's operations are covered by its parent's consolidated tax returns, which are current, so there are no delinquent tax returns for the Debtor.

17.    The July and August 2015 payments to Fannie were made via wire transfer on August 6, 2015.  The September payment was made via wire transfer on September 8, 2015.

18.    With regard to ***pre-petition*** payments to Fannie, the Receiver took over in April of 2015 and the receiver failed to make the April, May, and June payments.  Before the Receiver was appointed, the Debtor arranged in late March of 2015 to have excess funds ($21,481.23) held in its impound account applied toward the April 2015 payment–a process the Debtor and Fannie's loan servicer had agreed to in prior years.  However, the receiver's appointment scuttled that pending arrangement, and then the Receiver failed to make payments to Fannie.  Attached as Exhibit 2 is a true and correct copy of an e-mail confirming the arrangement with Fannie's loan servicer.

19.    On behalf of the Debtor, I did seek financing from a credit union, as well as multiple other sources.  We were disappointed when we were told that the credit union does not make loans to debtors in bankruptcy.  We never misled Fannie in any manner.  We  presently are exploring a possible sale of the real property to the Debtor's parent, who the Debtor believes can obtain financing to pay off creditors in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on the 22nd day of October 2015 at San Diego, California.

/s/ Cheryl R. Lee

_____
Cheryl R. Lee

# DECLARATION OF K. TODD CURRY

I, K. Todd Curry, declare as follows:

1.      I am an attorney at law duly licensed to practice before this Court and all courts of the State of California, and I am a principal of Curry Advisors, A Professional Law Corporation, which is proposed counsel for the debtor / debtor in possession, Tierra Del Rey, LLC.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, I would be competent to testify to such facts.

2.      Attached as Exhibit 3 is a true and correct copy of Fannie Mae's payoff statement provided to me by Fannie Mae's counsel.

3.      I notified Fannie Mae's counsel on August 17, 2015 that the FTB suspension had been lifted.  A true and correct copy of my e-mail to counsel (with attachments) is attached as Exhibit 4.

4.      I notified Fannie Mae's counsel on September 10, 2015 that the official DIP accounts had been opened.  A true and correct copy of my e-mail (without attachments) is attached as Exhibit 5.

5.      Attached as Exhibit 6 are true and correct e-mails I exchanged with Fannie Mae's counsel on August 31, 2015 and September 1, 2015.  I explained that the Debtor needs rents from its tenants to pay Fannie Mae, and most of those rents normally are received during first few days of each month, so it was virtually impossible for the Debtor to make large payments to Fannie before approximately the eighth day of the month.  I requested that the Debtor be allowed a few extra days to pay.  The response from Fannie Mae's counsel was that no extension would be granted.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

-15-

1       6.     AP Mortgage Company's counsel admitted to me on October 8, 2015 that it

2  abandoned its relief from stay motion because Fannie Mae's appraisal revealed that the Debtor's

3  real property was worth "closer to what the Debtor said it was worth."

4       I declare under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct and that this declaration was executed on the 22nd day of October

6  2015 at San Diego, California.

7                            /s/ K. Todd Curry

8                            _____

                              K. Todd Curry

# EXHIBIT 1

# $150,000

Chief Financial Officer Salary

## In USD as of Oct 22, 2015

| | |
|---|---|
| CFO Chief Financial Officer | $120,000 |
| CEO COO President | $130,000 |
| Chief Executive Officer | $150,000 |
| Chief Operating Officer | $138,000 |

11 more rows, 3 more columns

Chief Financial Officer Salary | Indeed.com
www.indeed.com/**salary/Chief-Financial-Officer**.html    Indeed.com

# Chief Operations Officer Salaries in San Diego, CA



# Chief Executive Officer Salaries in San Diego, CA

**San Diego Average** ▾

# $190K+

⚠ Salaries unavailable beyond $190K

➕ 9% National Average vs This Salary

**Add your salary to the graph!**
See how you compare to the average.

Your yearly salary    **Add**

**Salary Distribution** ▾

Showing Yearly Data ▾



Bottom 10%    Bottom 25%    **Average**    Top 25%    Top 10%

# EXHIBIT 2

## K. Todd Curry

| | |
|---|---|
| **From:** | crennlee@gmail.com on behalf of cheryl lee <cheryl@bvmh.org> |
| **Sent:** | Monday, July 06, 2015 10:05 PM |
| **To:** | K. Todd Curry |
| **Subject:** | Attached is the Email from FNMA Lender Approving Reserve Escrow Reimbursement |

**sandra@bvmh.org**                                                                    Mar 25

to Evan, Lee

Evan-

It was great speaking with you and thank you for getting the additional reservesapproved. So to confirm we will have a total of $21,481.23.We really appreciate your help. I will be preparing the items you requested so that we can get this processed asap.

Sandra

Sandra S. Bradford
Chief Financial Officer
Bay Vista Methodist Heights, Inc

"Leaving a Legacy for the Next Generation"

2607 First Avenue, Suite 1

San Diego, CA 92103

619-255-7920 Fax 619-255-7886

**Evan**                                                                               Mar 25
**Elwood Evan.Elwood@huntmortgagegroup.com via bounce.secureserver.net**

to sandra, Lee

Hey Sandra,

It was great speaking with you as well!  Sorry, I went into a meeting as soon as I got off the phone with you.  Yes, the final approved amount from your request is going to be $21,481.23.  I'll finish the paperwork here, so just let me know when the balance is going to be sent so I can tell the accountants how to apply the funds.

1

Have a great evening!

**Evan Elwood**  |  Associate  |  Agency Special Asset Management

Phone: 972-868-5763  |  Fax: 972-868-5705

14850 Quorum Drive Suite 150  |  Dallas, TX  |  75254

Hunt Mortgage Group  |  evan.elwood@huntmortgagegroup.com

www.huntmortgagegroup.com

--
Cheryl R. Lee, CEO &
Chief Legal Officer
Bay Vista Methodist Heights, Inc
*"Leaving a Legacy for the Next Generation"*
2607 First Avenue, Suite 1
San Diego, CA 92103
619-255-7920 Fax 619-255-7886

# EXHIBIT 3

## K. Todd Curry

| | |
|---|---|
| **From:** | Thomas Van <thomasv@hhlawgroup.com> |
| **Sent:** | Friday, August 21, 2015 1:44 PM |
| **To:** | K. Todd Curry; Kristin.T.Mihelic@usdoj.gov; Mike Wright |
| **Cc:** | David Hershorin |
| **Subject:** | RE: Tierra Del Rey- Payoff Statement for Fannie Mae (2200-55) |
| **Attachments:** | Tierra Del Rey Payoff Statement 9-1-15.pdf |

Counsels:

Attached please find an updated Payoff Statement for Fannie Mae's loan. Please let me know if you have any questions. Thank you.

Thomas S. Van, Esq.
Hershorin & Henry, LLP
27422 Portola Parkway, Suite 360
Foothill Ranch, CA 92610
Tel: (949) 859-5600, Ext. 318
Fax: (949) 859-5680
www.hhlawgroup.com

**From:** K. Todd Curry [mailto:tcurry@currylegal.com]
**Sent:** Monday, August 17, 2015 12:45 PM
**To:** Kristin.T.Mihelic@usdoj.gov; David Hershorin <DavidH@hhlawgroup.com>; Thomas Van <thomasv@hhlawgroup.com>; Mike Wright <MWright@mikewrightlaw.com>
**Subject:** Tierra Del Rey--Proof of Good Standing

Dear Counsel,

I wanted to update you regarding the FTB issue. The tax issue was resolved a few weeks ago with confirmation of the group non-profit tax exemption, but it has taken time to obtain written proof that the Debtor is in good standing. We now have that proof.

Attached are certificates of good standing from the CA Secretary of State and the CA Franchise Tax Board.

Thank you for your patience on this issue. Let me know if you have any questions.

Best regards,

K. Todd Curry, Esq.
**CURRY ADVISORS**
A Professional Law Corporation
525 B Street, Ste. 1500
San Diego, CA 92101
T  619.238.0004 | F  619.238.0006
Broker CA BRE # 01926449

-----------------------------------------------------------------------------------------------------------------

NOTICE: This email message is for the sole use of the intended recipient(s)
and may contain confidential and privileged information. Any unauthorized

1



HUNT MORTGAGE GROUP

104850 Quorum Drive
Suite 150
Dallas, TX 75254
PHONE (972) 868-5700
FAX (972)868-5705

## PAYOFF STATEMENT

Tierra Del Rey, LLC
c/o Bay Vista Methodist Heights, Inc.
2607 First Avenue, Suite 1
San Diego, CA 92103
Attn: Cheryl Lee, CEO
Phone: 619-255-7920
Email: cheryl@bvmh.org

| | |
|---|---|
| Date: | 8/20/2015 |
| Loan Number: | 10094505 |
| Property Name: | Tierra Del Rey |
| | 3675 King Street |
| | La Mesa, CA 91941 |
| Borrower: | Attn: Cheryl Lee, CEO |

**All figures are given upon the condition that they will not be considered as an estoppel against
Hunt Mortgage Group**

**Payoff date:    September 1, 2015**

| | | |
|---|---|---|
| Scheduled Principal Balance | $ | 4,218,192.57 |
| Interest for March, April, May, June, July and August 2015 | | 102,408.35 |
| Yield Maintenance Due | | 634,502.18 |
| Late Charge for March and April 2015 | | 2,368.28 |
| Default Interest:  From 5/1/2015 to 9/1/2015 | | 57,648.64 |
| PLM Management - Trustee Fees | | 8,906.66 |
| Brokers Opinion of Value | | 500.00 |
| Property Needs Assessment | | 2,750.00 |
| Phase I Environmental Assessment | | 2,700.00 |
| Appraisal (estimate) | | 5,000.00 |
| Fannie Mae Legal Fees | | 30,466.12 |
| Payments Received | | (56,731.26) |

Wire transfer of the Total Amount Due must be received by
3 PM Eastern Standard Time on the date for which the
payoff statement is computed.  Funds must be wired in
accordance with the below wiring instructions:

Total Amount Due:  **$      5,008,711.54**

Bank Name:
ABA Number:
Account Name:
Account Number:

KeyBank, National Association
041-001-039
Hunt Mortgage Group Payment Clearing
359954010922

**Reference:   Loan #**

Prepared by:  Kirsten Bolinger
Phone: (972) 868-5758

**10094505**

Approved by:

Kirsten Bolinger, Director

# EXHIBIT 4

## K. Todd Curry

| | |
|---|---|
| **From:** | K. Todd Curry <tcurry@currylegal.com> |
| **Sent:** | Monday, August 17, 2015 12:45 PM |
| **To:** | Mihelic, Kristin T. (USTP) (Kristin.T.Mihelic@usdoj.gov) (Kristin.T.Mihelic@usdoj.gov); David Hershorin (DavidH@hhlawgroup.com) (DavidH@hhlawgroup.com); Thomas Van (thomasv@hhlawgroup.com); Mike Wright (MWright@mikewrightlaw.com) |
| **Subject:** | Tierra Del Rey--Proof of Good Standing |
| **Attachments:** | Cert Good Standing FTB.pdf; Cert Good Standing SOS.pdf |

Dear Counsel,

I wanted to update you regarding the FTB issue. The tax issue was resolved a few weeks ago with confirmation of the group non-profit tax exemption, but it has taken time to obtain written proof that the Debtor is in good standing. We now have that proof.

Attached are certificates of good standing from the CA Secretary of State and the CA Franchise Tax Board.

Thank you for your patience on this issue. Let me know if you have any questions.

Best regards,

K. Todd Curry, Esq.
**CURRY ADVISORS**
A Professional Law Corporation
525 B Street, Ste. 1500
San Diego, CA 92101
T  619.238.0004 | F  619.238.0006
Broker CA BRE # 01926449
-----------------------------------------------------------------------------------------------------------------

NOTICE: This email message is for the sole use of the intended recipient(s)
and may contain confidential and privileged information. Any unauthorized
review, use, disclosure or distribution is prohibited. If you are not the intended
recipient, please contact the sender by reply email and destroy all copies of
the original message.
Thank you.

1

common good / privacy / All people Liberty Speak Conscience / without discrimination

## California Secretary of State Alex Padilla

Secretary of State Main Website    **Business Programs**    Notary & Authentications    Elections    Campaign & Lobbying

**Business Entities (BE)**

Online Services
- **E-File Statements of Information for Corporations**
- **Business Search**
- **Processing Times**
- **Disclosure Search**

**Main Page**

**Service Options**

**Name Availability**

**Forms, Samples & Fees**

**Statements of Information**
(annual/biennial reports)

**Filing Tips**

**Information Requests**
(certificates, copies & status reports)

**Service of Process**

**FAQs**

**Contact Information**

Resources
- **Business Resources**
- **Tax Information**
- **Starting A Business**

Customer Alerts
- **Business Identity Theft**
- **Misleading Business Solicitations**

## Business Entity Detail

Data is updated to the California Business Search on Wednesday and Saturday mornings. Results reflect work processed through Friday, August 14, 2015. Please refer to **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity.

| Entity Name: | TIERRA DEL REY, L.L.C. |
|---|---|
| Entity Number: | 200919810172 |
| Date Filed: | 07/16/2009 |
| Status: | ACTIVE |
| Jurisdiction: | CALIFORNIA |
| Entity Address: | 2607 1ST AVENUE STE 1 |
| Entity City, State, Zip: | SAN DIEGO CA 92103 |
| Agent for Service of Process: | CHERYL R LEE |
| Agent Address: | 2607 1ST AVENUE STE 1 |
| Agent City, State, Zip: | SAN DIEGO CA 92103 |

\* Indicates the information is not contained in the California Secretary of State's database.

**\* Note:** If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report.

- For information on checking or reserving a name, refer to **Name Availability**.
- For information on ordering certificates, copies of documents and/or status reports or to request a more extensive search, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Field Descriptions and Status Definitions**.

**Modify Search    New Search    Printer Friendly    Back to Search Results**

**Privacy Statement** | **Free Document Readers**
Copyright © 2015    California Secretary of State

STATE OF CALIFORNIA
**FRANCHISE TAX BOARD**
PO BOX 1286
SACRAMENTO CA 94257-0540

## Entity Status Letter

TIERRA DEL REY, L.L.C.
2607 1ST AVE STE 1
SAN DIEGO, CA 92103-6506

Date: 08/12/2015

ESL ID:

According to our records, the following entity information is true and accurate as of the date of this letter.

Entity ID:     200919810172

Entity Name: TIERRA DEL REY, L.L.C.

☒    1.   The entity is in good standing with the Franchise Tax Board.

☐    2.   The entity is **not** in good standing with the Franchise Tax Board.

☒    3.   The entity is currently exempt from tax under Revenue and Taxation Code (R&TC) Section 23701h.

☐    4.   We do not have current information about the entity.

The above information does not necessarily reflect:
- The entity's status with any other agency of the State of California, or other government agency.
- If the entity's powers, rights, and privileges were suspended or forfeited at any time in the past, or the entity did business in California at a time when it was not qualified or not registered to do business in California:
  o   The status or voidability of any contracts made in California by the entity at a time when the entity was suspended or forfeited (R&TC Sections 23304.1, 23304.5, 23305a, 23305.1).
  o   For entities revived under R&TC Section 23305b, any time limitations on the revivor or limitation of the functions that can be performed by the entity.

**Internet and Telephone Assistance**

Website:     **ftb.ca.gov**
Telephone:  800.852.5711 from within the United States
                 916.845.6500 from outside the United States
TTY/TDD:    800.822.6268 for persons with hearing or speech impairments

FTB 4263A (REV 02-2012)

# State of California
## Secretary of State

### CERTIFICATE OF STATUS

**ENTITY NAME:**   TIERRA DEL REY, L.L.C.

| | |
|---|---|
| **FILE NUMBER:** | 200919810172 |
| **FORMATION DATE:** | 07/16/2009 |
| **TYPE:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **JURISDICTION:** | CALIFORNIA |
| **STATUS:** | ACTIVE (GOOD STANDING) |

I, ALEX PADILLA, Secretary of State of the State of California, hereby certify:

The records of this office indicate the entity is authorized to exercise all of its powers, rights and privileges in the State of California.

No information is available from this office regarding the financial condition, business activities or practices of the entity.



IN **WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of August 14, 2015.

**ALEX PADILLA**
Secretary of State

PAM

*NP-25 (REV 01/2015)*

# EXHIBIT 5

## K. Todd Curry

| | |
|---|---|
| **From:** | K. Todd Curry <tcurry@currylegal.com> |
| **Sent:** | Thursday, September 10, 2015 3:14 PM |
| **To:** | Mihelic, Kristin T. (USTP) (Kristin.T.Mihelic@usdoj.gov) (Kristin.T.Mihelic@usdoj.gov) |
| **Cc:** | David Hershorin (DavidH@hhlawgroup.com) (DavidH@hhlawgroup.com); Mike Wright (MWright@mikewrightlaw.com); spencer.ruberti@trigild.com |
| **Subject:** | Tierra Del Rey #15-04253-LT11 |
| **Attachments:** | DIP Acct Info.pdf; Order (entered) cash Collateral.pdf |

Kristin,

Attached are documents evidencing the opening of the DIP accounts at City National Bank.

By a copy of this e-mail to Spencer Ruberti, agent for the receiver Mr. Hoffman, I am requesting that all funds held by the receiver be turned over to "Tierra Del Rey, Debtor In Possession" so that they can be deposited into the cash collateral account. This is required by paragraph 8 of the attached order.

Thanks.

K. Todd Curry, Esq.
**CURRY ADVISORS**
A Professional Law Corporation
525 B Street, Ste. 1500
San Diego, CA 92101
T 619.238.0004 | F 619.238.0006
Broker CA BRE # 01926449
-----------------------------------------------------------------------------------------------------------

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
Thank you.

# EXHIBIT 6

## K. Todd Curry

| | |
|---|---|
| **From:** | David Hershorin <DavidH@hhlawgroup.com> |
| **Sent:** | Tuesday, September 01, 2015 1:39 PM |
| **To:** | K. Todd Curry |
| **Subject:** | Re: September payment |

Todd,

This is not acceptable to Fannie Mae. Fannie Mae expects full compliance with the terms of the Order approving the use of cash collateral.

Aside from the payment issues and the Debtor's continued failure to open the DIP account, several insurance issues remain unresolved.  I will send you a separate email detailing the non compliant insurance.

Also, I still have not received any accounting or update on the refinance.

Regards,

David

Sent from my iPhone

On Aug 31, 2015, at 1:29 PM, K. Todd Curry <tcurry@currylegal.com> wrote:

> David,
>
> As I promised previously, I wanted to make sure I am out in front of the September payment.  To that end, here is what I have been told:  Rents are collected and deposited starting on the 1st and continuing through about the 5th or the 6th.  By the 8th, the debtor knows what has cleared.  As a result, the debtor has always had the payment auto-debited on the 8th, which under the loan documents is timely in the sense that the payment is not late.  Would it be acceptable to wire the September payment on the 8th?
>
> Also, we expect that the DIP account will be opened at City National Bank early this week.  The debtor tried to open it with Torrey Pines, but some issue came up that made the debtor switch.  Once the money from the receiver is paid over to the DIP account, the cushion should enable the debtor to pay on the 1st going forward.
>
> Would this be acceptable?
>
> Thanks.
>
> K. Todd Curry, Esq.
> **CURRY ADVISORS**
> A Professional Law Corporation
> 525 B Street, Ste. 1500
> San Diego, CA 92101
> T  619.238.0004 | F  619.238.0006
> Broker CA BRE # 01926449

1